# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

LORI JOHNSON,

        Plaintiff,

vs.

FEDERAL EXPRESS CORPORATION,
d/b/a FedEx Express,

        Defendant.

No. C07-3052-MWB

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

*I.* **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      *1. Johnson's employment at FedEx* . . . . . . . . . . . . . . . . . . . . . 2
      *2. Johnson's use of FedEx washer fluid* . . . . . . . . . . . . . . . . . 3
      *3. Johnson's successful appeal of her termination* . . . . . . . . . 6
      *4. Charlton's use of FedEx duct tape* . . . . . . . . . . . . . . . . . . . 8
      *5. The scheduling of delivery routes* . . . . . . . . . . . . . . . . . . . 9
   *B. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*II.* **LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   *A. Standards for Summary Judgment* . . . . . . . . . . . . . . . . . . . . . . 12
   *B. Sex Discrimination* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
      *1. Johnson's prima facie case* . . . . . . . . . . . . . . . . . . . . . . . . 20
      *2. FedEx's legitimate, nondiscriminatory reason* . . . . . . . . . . 21
      *3. Pretext* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
         *a. Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . 22
            *i. FedEx's initial arguments* . . . . . . . . . . . . . . . 22
            *ii. Johnson's response* . . . . . . . . . . . . . . . . . . . 23
            *iii. FedEx's reply* . . . . . . . . . . . . . . . . . . . . . . . . 24
            *iv. Oral arguments* . . . . . . . . . . . . . . . . . . . . . . 25
         *b. Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*C. Retaliation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## I. INTRODUCTION

### A. Factual Background

The court will not attempt, here, an exhaustive dissertation on the undisputed and disputed facts in this case. Rather, the court will set forth sufficient facts, both undisputed and disputed, to put the parties' arguments in context concerning the defendant's motion for summary judgment. Unless otherwise indicated, the facts recited here are undisputed, at least for purposes of summary judgment. Additional factual allegations and the extent to which they are or are not disputed or material will be discussed, if necessary, in the court's legal analysis.

### 1. Johnson's employment at FedEx

FedEx hired Johnson in October of 1983. In October 2003, Johnson transferred to the station[1] in Mason City, which is known as MCWA and is part of the Northland District, as a courier. MCWA is one of several stations managed by Mike Ziniel, a Senior Manager[2]. In February 2004, and while still at MCWA, Johnson became a swing driver, which is a courier who does not have a regularly assigned route but who instead provides

---

[1]FedEx couriers, who deliver to and pick up packages from customers, primarily work out of facilities or "stations" that have a defined delivery and pickup area and are part of a larger district made up of several stations.

[2]A Senior Manager has overall responsibility for each station and supervises one or more Operations Managers, who manage the hourly employees (such as couriers and handlers) and oversee the daily operations of the station.

coverage for open routes or other couriers who are sick, on vacation, or otherwise unavailable.

In June 2004, Robert Foell transferred to MCWA as the sole Operations Manager. In this position, Foell became Johnson's direct supervisor, and he began reporting to Ziniel. Since his arrival at MCWA, Foell has never made any sexually-based comments in the workplace, has not made any negative or derogatory comments about women in general, and has not made any negative or derogatory statements about any particular female employee, including Johnson. Foell, as Johnson's supervisor, did not have any criticisms of Johnson's job performance, generally. Johnson was punctual, conscientious, and knowledgeable. Johnson also had the most seniority of any employee at the facility.

### 2. Johnson's use of FedEx washer fluid

On January 6, 2006, at 5:15 p.m., Matt Charlton (a FedEx employee at the time) approached Foell and told him that he had something that was bothering him—that he had witnessed Johnson taking company property. Charlton complained that Johnson took windshield washer fluid from the FedEx warehouse for her personal vehicle, that two other people—Sean Pritchard and Dave Voortman—had witnessed it, and that he thought this was theft and was against company policy. In response to a request from Foell, Charlton completed a written statement, in which he stated that, on January 4th, he saw Johnson taking company property—windshield washer fluid—for use in her personal vehicle.

On January 6, 2006, Foell met with Pritchard and asked if he had witnessed any inappropriate activity at the station. Pritchard asked: "Do you mean Lori taking washer fluid?" Pritchard provided Foell with a written statement that evening. The statement provided that Pritchard saw Johnson "grab a gallon of windshield wash to top off her car." It also stated that Pritchard jokingly said to her the following day: "Did you put any money in the kitty for the fluid?" Pritchard stated that Johnson replied: "No. It is to make up for

working through breaks." Johnson denies that Pritchard could recall exactly what amount of washer fluid was taken and denies that she told him the washer fluid was making up for working through breaks.

On January 6, 2006, Foell also talked to Dave Voortman—a FedEx vendor—who told Foell that he had seen Johnson take a gallon of washer fluid for her personal car. On January 9, 2006, Voortman provided Foell with a statement of what he had observed, which included Johnson saying she did not have time to stop and get any fluid.

On or about January 6, Foell called Ziniel and conveyed to him what Charlton had said, and Ziniel instructed Foell to contact Dale Edwards—a Senior Human Resources Representative—and advise him of the situation. Foell then called Edwards, who advised him to talk to Johnson about the incident, get a written statement from her, and place her on paid investigative suspension, which is the procedure set forth in FedEx Policy 2-5[3]. Because Plaintiff had already gone home by the time Foell spoke to Edwards, he called her on Sunday, January 8, 2006, and asked her to report to work early on Monday, January 9th.

The morning of January 9, 2006, Johnson came to work at 7:15 a.m. Johnson met with Foell and Ziniel, as had been arranged. Foell and Ziniel asked Johnson if she had done anything against the conduct policy the last two weeks. Johnson told them that the

---

[3]Johnson received a copy of the FedEx Employee Handbook in 2002, which refers to Policy 2-5, Acceptable Conduct, part of the FedEx policy manual (known as "The People Manual"). Policy 2-5 addresses employee conduct issues and the policy provision in force in January 2006 specifically prohibits "Theft, including unauthorized possession of Company or customer property or the property of other employees," and Johnson was aware of this policy. The prohibition in Policy 2-5 against theft applies equally to both long-term and short-term employees, and it does not place a minimum dollar amount on the property before it is considered a violation of the policy, nor does the policy require that the employee have prior incidents of dishonesty in their history.

only thing that she could think of was that she put some washer fluid in her car. Foell and Ziniel asked Johnson for a statement, which she wrote out and gave to them. The statement provided: "Before leaving for home, I put in 3 cups of anti-freeze in my personal car so it would be safe for me to drive home in slushy road conditions." According to FedEx, Foell and Ziniel gave Johnson an opportunity to write out whatever she wanted to in her statement and, after completing the statement, she did not provide Foell and Ziniel with additional information. Johnson claims that she was intimidated and felt that Foell and Ziniel did not want additional information. After Johnson wrote out her statement, Foell and Ziniel placed her on paid investigative suspension, which was consistent with FedEx policy. Neither Foell or Ziniel asked Johnson any other questions.

FedEx alleges that, because Johnson claimed that the roads were slushy on January 4, Foell pulled prior weather history off of the Internet. Foell allegedly found the following information on the Internet: 0.0 inches of precipitation on January 1, 0.05 inches of precipitation on January 2, 0.0 inches of precipitation on January 3, and 0.01 inches of precipitation on January 4. The weather information available to Foell also established that the temperature rose above freezing, to 34 degrees, on January 4, 2006, and it was a sunny day. Johnson claims that this warmer weather caused accumulated snow to melt on the roads. FedEx claims that, based on Foell's discovery about the weather, Foell and Ziniel did not believe that the roads were slushy. Additionally, FedEx claims that both Foell and Ziniel believed that she did not need the fluid to get home safely because there is a gas station near MCWA that sells washer fluid, and she could have simply gone to that gas station to purchase fluid if she had truly needed it. The closest gas station to the Mason City facility is not in the direction that Johnson would drive home. Johnson claims that it is probably a couple miles from the Mason City facility.

After receiving the written statements, Foell discussed the situation with Ziniel and Edwards and showed them the written statements and weather information. FedEx claims that Foell, Ziniel, and Edwards discussed Johnson's length of employment and whether an exception should be made to issue her a Warning Letter in lieu of termination. They concluded that termination was appropriate because Johnson had two prior letters in 2004 and a third letter would have meant that she had 3 letters in a period of about 1 ½ years, which they felt was excessive. Foell terminated Johnson's employment on January 10, 2006.

Prior to her suspension, Johnson never brought any washer fluid to the station to replace the fluid she put in her car, nor did she tell anyone in management what she had done or the reasons why she had done it. Both prior to and after her termination, Johnson never made an offer of restitution to replace the washer fluid that she took. Rather, Johnson claims that she had already put fluid in the FedEx truck earlier at her house. However, at no time prior to her termination did Johnson ever inform Foell or Ziniel that she had previously put her own personal washer fluid in her FedEx vehicle while at her home. In addition, Johnson knew there was a procedure to get reimbursed for any personal washer fluid she put in a FedEx truck. The gallon of washer fluid which Johnson had previously purchased, and used in the FedEx truck, cost $1.39. Three cups of washer fluid would cost approximately $0.26.

### 3. *Johnson's successful appeal of her termination*

FedEx has an internal grievance appeal procedure, known as the Guaranteed Fair Treatment ("GFT") procedure, whereby employees can appeal disciplinary actions through three levels. The three levels consist of the following: the Managing Director (Step 1), then the Regional Vice-President (Step 2), and then a corporate Appeals Board (Step 3),

and, at any step of the process, the discipline can be upheld, modified up or down, or overturned.

FedEx also has an internal EEO complaint procedure, whereby employees who feel they have been discriminated or retaliated against can file a complaint—known as an IEEO. The IEEO complaints are investigated by the Managing Director and a Human Resources Representative.

On January 13, 2006, Johnson filed an GFT appeal regarding her termination. She also filed a Charge of Discrimination with the Iowa Civil Rights Commission on January 17, 2006, and an IEEO on January 24, 2006. Pursuant to FedEx policy, the GFT appeal was deferred while Johnson's IEEO claims were being investigated, which concluded on around March 15, 2006.

Johnson's Step I GFT meeting was held on March 24, 2006, with Linda Sokolik—the Managing Director—who upheld the termination on March 28, 2006. At Step 2 of the GFT process, Thomas Lynch—the Regional Vice President—exercised his discretion and, by letter dated April 14, 2006, modified Johnson's termination to a Warning Letter and 30-day unpaid suspension. FedEx claims that, although Lynch concluded that the facts substantiated that Johnson violated FedEx policy by removing FedEx property for her own personal use and that the situation "merits severe discipline," Johnson understood that she was reinstated in consideration of her tenure with FedEx. Johnson disagrees with the accusation that her conduct warranted severe discipline, because the policy regarding removing company property for personal use was not evenly enforced. On April 27, 2006, Johnson was reinstated in her position and, at some point, received back pay for days that she missed work, except for the 30-day period of unpaid suspension.

### 4.    Charlton's use of FedEx duct tape

About a month after Johnson's termination, on February 2, 2006, Matthew Charlton used a strip of duct tape to repair his vehicle.  Charlton had used duct tape from the storage closet at the FedEx facility to secure a headlight on his Chrysler New Yorker—the duct tape was on his vehicle from February through June of 2006.  Pritchard saw Charlton use the duct tape to fix the headlight on his car, and the day after Charlton used the duct tape, Pritchard asked Charlton what the difference was between what he did and what Johnson did in putting windshield washer fluid in her car.  Charlton acknowledged, either verbally or by his silence, that there was no difference.

Charlton later called Foell and told him that he had used duct tape to repair his vehicle and, that if he needed to, he would be more than willing to buy a new roll of duct tape to replace what he had used.  Foell told Charlton "don't worry about it, we'll talk tomorrow when I come in. . ."  Foell did not ask Charlton to replace the duct tape that he had used.  Foell did not ask Charlton whether he had intended to replace the duct tape when he initially took it.  Neither Foell nor anyone else at FedEx conducted an investigation nor asked Charlton for his statement before he left the company in August 2006.

Johnson claims that, before Charlton's conversation with Pritchard, Charlton had no intention of telling Foell about the use of duct tape.  In fact, Johnson alleges that Charlton did tell Foell that the reason he had reported his use of the duct tape was because Pritchard had pressured him to do so.  FedEx, however, denies that Charlton did not intend to report the use of duct tape and cites Charlton's claim that he intended to tell Foell about it.  FedEx also denies that Charlton informed Foell of the reason why he was reporting the use of the tape.  Charlton was not disciplined in any way for taking duct tape from the company for his personal use.

In mid March, 2006, Sean Pritchard approached Ziniel and asked him if he was aware of the duct tape incident involving Charlton. Johnson claims that Pritchard gave him a copy of a letter that he had provided to Johnson about the Charlton incident. Johnson claims that Pritchard gave Ziniel a letter and, upon receiving the letter from Pritchard, responded that "everything was taken care of," read the letter, and gave it back to Pritchard. FedEx admits that Ziniel responded that the matter had been taken care of but disputes whether Ziniel was given the letter. No one from FedEx interviewed Pritchard after he spoke with Ziniel about the Charlton incident. Johnson claims that Foell had told Charlton that he was to keep quiet about the incident. FedEx objects to this claim, alleging that it is inadmissible hearsay. Even assuming a letter was provided, FedEx disputes whether the letter provided as Exhibit 40, *see* Plaintiff's App. at 100, was the letter provided and objects to the court's consideration of the letter due to Johnson's failure to lay a foundation and authenticate the letter.

## 5. *The scheduling of delivery routes*

There are normally ten FedEx delivery routes which originate out of the Mason City facility. There are normally twelve to fourteen drivers who work out of the Mason City facility including two swing drivers. Foell was responsible for scheduling all of the employees at the Mason City facility, except that regular couriers were assigned a set route in a defined geographical area that they obtained through a seniority-based bidding process. Johnson claims that she and Lois Patterson[4] observed a difference between the route assignments for men and women who worked at the Mason City facility. Johnson also claims that the women drivers were required to work more hours later in the day than men.

---

[4]Lois Patterson worked for FedEx at the Mason City facility as a route driver from August, 1985 to March, 2007, or almost twenty-two years.

In fact, Johnson claims that Bob Crum, the other swing driver, had not worked as long as Johnson yet was given preferable route assignments and that Foell generally accommodated male drivers who had doctor's appointments or obligations after work but did not give the women drivers the same consideration. Foell had much more social interaction with the men than he did the women. Johnson claims that Ziniel treated women differently than men in that he was very short and angry with them.

Johnson alleges that Foell's distribution of routes and other work evidences his disparate treatment of female workers. Johnson claims that drivers generally have a preference for routes that get off early, before 3:00 or 4:00 in the afternoon, and that Foell accommodated a route driver, Rich Potter, whose son played football. He was allowed to work four ten-hour days. Johnson claims that Foell accommodated a route driver, Bruce Carr, who had a Wednesday afternoon golf date. FedEx denies that such an accommodation was made. In addition, it is undisputed that Foell did not have the authority to change route assignments without going through the bidding process, but Jeremy Hanson was allowed to switch routes without going through the bidding process. Johnson also claims that only women were required to help with unloading the freight trucks. FedEx denies this and claims that Rich Potter, Bruce Crum, and Dawn Winkowitsch were the FedEx employees who helped the most with unloading.

In March, 2006, Lois Patterson complained to Mike Ziniel that the work was not being allocated equally. Ziniel claimed that the hourly statistics showed that the hours worked by men and women were "extremely equal." Johnson claims that Ziniel disciplined Patterson for complaining about the unequal distribution of work hours. FedEx denies that Patterson was disciplined and claims that she was instructed to perform online counseling, which FedEx does not consider discipline.

Professor Mark Kaiser, a professor of Statistics at Iowa State University, conducted an analysis of the work schedules of male and female employees at the Mason City FedEx facility—his analysis allegedly shows that there were significant differences in the number of hours worked and the ending times for men and women for the period prior to Patterson's complaint to Ziniel about the unequal treatment. FedEx denies the findings of the report and claims that it is objectionable.

## B. Procedural Background

On July 31, 2007, Johnson filed her Complaint and Jury Demand against FedEx, with this court (docket no. 1)—Johnson filed an Amended Complaint and Jury Demand on August 23, 2007 (docket no. 9-3). In her complaint, Johnson claims that FedEx treated her differently from the male employees in the terms and conditions of her employment and retaliated against her for opposing discrimination in the workplace, in violation of 42 U.S.C. § 2000e *et. seq.* (Count 1) and Chapter 216 of the Iowa Code (the Iowa Civil Rights Act ("ICRA")) (Count 2). Johnson also alleges that FedEx retaliated against her when it terminated her employment on January 10, 2006, in response to her alleged opposition to discriminatory acts, in violation of § 2000e *et. seq.* (Count 3) and Chapter 216 of the Iowa Code (Count 4).

FedEx filed a Motion for Summary Judgment (docket no. 43) on December 2, 2009. In its motion, FedEx asserts that it is entitled to summary judgment on Johnson's sex discrimination claims because she is not able to demonstrate that FedEx's reason for terminating her was pretext for unlawful discrimination. FedEx claims that Johnson cannot show that she was treated differently than a similarly situated male employee or that FedEx did not honestly believe the reasons for her termination and discipline. FedEx claims that summary judgment should be granted on Johnson's retaliation claims because she cannot

establish that her February, 2005, IEEO complaint constitutes a protected activity—she cannot establish a connection between her termination or discipline and any protected activity—and she cannot demonstrate that FedEx's reasons for her termination or discipline were pretextual.

On December 30, 2009, Johnson filed her Partial Resistance to Defendant's Motion for Summary Judgment (docket no. 46). In her resistance, Johnson alleges that FedEx is not entitled to summary judgment on her sex discrimination claims because she has produced sufficient evidence to establish a genuine issue of material fact for each element of the claims. However, Johnson does not resist FedEx's motion for summary judgment on her claims of retaliation.

FedEx filed its reply brief, entitled Memorandum of Law in Support of Defendant's Motion for Summary Judgment (docket no. 54), on January 12, 2010. On January 13, 2010, Johnson filed her Second Supplemental Appendix in Resistance to Defendant's Motion for Summary Judgment (docket no. 55).

On January 22, 2010, this court held telephonic oral arguments on Defendant's Motion for Summary Judgment. Mark Sherinian, of Sherinian & Walker Law Firm, argued on Johnson's behalf. Keith Thomas, a FedEx lawyer appearing *Pro Hac Vice* (*see* docket no. 6), argued on behalf of FedEx. The arguments were spirited and both counsel were exceptionally well prepared and responsive to the court's numerous questions.

The jury trial in this case is scheduled to commence on March 8, 2010.

## II. LEGAL ANALYSIS

### A. Standards for Summary Judgment

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 127

12

S. Ct. 1955, 1982 (2007); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Any party may move for summary judgment regarding "all or any part" of the claims asserted in a case. FED R. CIV. P. 56(a), (b) (allowing a claimant to move for summary judgment "at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party," and allowing a defending party to move for summary judgment "at any time"). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." *Id*. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id*. An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d

820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence"). Evidence presented by the nonmoving party that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, such as a "scintilla of evidence," *Anderson*, 477 U.S. at 252; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997), or evidence that is "merely colorable" or "not significantly probative," *Anderson* at 249-50, does not make an issue of material fact genuine.

Thus, a *genuine issue of material fact* is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence*, 358 F.3d 982, 985 (8th Cir. 2004). "'Instead, "the dispute must be outcome determinative under prevailing law."'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910-11 (8th Cir. 2005) (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992), in turn quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). In other words, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. Essentially, a genuine issue of material fact determination, and thus the availability of summary judgment, is a determination of "whether a proper jury question [is] presented." *Id.* at 249. A proper jury question is present if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

Procedurally, the moving party does not have to "support its motion with affidavits or other similar materials *negating* the opponent's claim," *Celotex*, 477 U.S. at 323, but the moving party does bear "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Thus, a

movant need only demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley*, 415 F.3d at 910 ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))). Thus, the movant must show the absence of a genuine issue of material fact as it relates to the substantive law, and the nonmovant must show the alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 322; *In re Temporomandibular Joint*, 113 F.3d at 1492.

In considering whether a genuine issue of material fact is present the court must view all the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88; *Mosley*, 415 F.3d at 910. Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita*, 475 U.S. at 587-88. However, "because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather than "attempt[ing] to determine the truth of the matter . . . the court's function is

to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

Of course, the facts are not the sole concern of the court; after all, a genuine issue of material fact necessarily depends on the substantive law. *See Holloway*, 884 F.2d at 366 ("The presence of a genuine issue of fact is predicated on the existence of a legal theory which can be considered viable under the nonmoving party's version of the facts. The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law."). Thus, the relevant law concerning plaintiff's claims is pivotal. *Anderson*, 477 U.S. at 252 ("[T]he inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."); *see Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998) ("'In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law.'" (quoting *Hartnagel*, 953 F.2d at 396)). Even if no genuine issue of material fact is present, summary judgment is not appropriate unless the governing law supports the moving party's position. FED. R. CIV. P. 56(c) (requiring the moving party to show that it "is entitled to judgment as a matter of law"). Moreover, summary judgment is particularly appropriate "where the unresolved issues are primarily legal rather than factual." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996).

The court recognizes "that summary judgment is disfavored in employment discrimination cases." *Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005); *see Woods v. Perry*, 375 F.3d 671, 674 (8th Cir. 2004) ("[S]ummary judgment should be used sparingly in employment discrimination cases . . . ."); *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994) ("[S]ummary judgment should seldom be

used in employment discrimination cases."). This exceptional deference shown the nonmoving party is warranted, according to the Eighth Circuit Court of Appeals, "[b]ecause discrimination cases often turn on inferences rather than on direct evidence . . . . ," *E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001) (*en banc*) (citing *Crawford*, 37 F.3d at 1341; *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999)), and because "intent" is generally a central issue in employment discrimination cases. *Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1071 (8th Cir. 1998) (citing *Gill v. Reorganized Sch. Dist. R-6, Festus, Mo.*, 32 F.3d 376, 378 (8th Cir. 1994)); *see Simpson*, 425 F.3d at 542 (noting summary judgment is disfavored in employment discrimination cases because they are "'inherently fact-based.'" (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 806 (8th Cir. 2003))). Nonetheless, this exercise of judicial prudence "cannot and should not be construed to exempt" from summary judgment, employment discrimination cases involving intent. *Christopher*, 137 F.3d at 1071 (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 959 (8th Cir. 1995)). The fact remains that "'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The court will apply these standards to the defendants' Motion for Summary Judgment.

However, the court must first observe that stating the legal principles of summary judgment in employment discrimination cases is a simple task. Applying those principles to the paper record that forms the judicial crucible that decides which plaintiffs may proceed to trial and which get dismissed is far more daunting. Missing in the standard incantation of summary judgment principles is the role of experience. Justice Oliver Wendell Holmes wrote, "The life of the law has not been logic; it has been experience."

OLIVER WENDELL HOLMES, THE COMMON LAW 1 (1881). Thus, experience teaches that thoughtful deliberation of summary judgment in employment discrimination cases is grounded in the consideration of each case through a lens filtered by the following observations. Employment discrimination and retaliation, except in the rarest cases, is difficult to prove. It is perhaps more difficult to prove today—more than forty years after the passage of Title VII, which is at issue here—than during Title VII's earlier evolution. Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it. *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697-98 (7th Cir. 1987). Indeed, the Fifth Circuit Court of Appeals recognized more than thirty-five years ago, that "[a]s patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate discrimination among employees." *Rogers v. EEOC*, 454 F.2d 234, 239 (5th Cir. 1971) (later relied on by the Supreme Court in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-67 (1986), as one of the principal authorities supporting recognition of a cause of action for hostile environment sexual harassment under Title VII). This court's experience suggests the truth of that observation. Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination are proportional to the caliber of the employee, discrimination against the best employees is the least cost effective. *See, e.g., id*. Rather, discrimination plaintiffs tend to be those average or below-average

workers—equally protected by Title VII and the Iowa Civil Rights Act—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., id.* Consequently, with both the legal standards for summary judgment and the teachings of experience in hand, the court turns to consideration of the parties' arguments for and against summary judgment.

## B. Sex Discrimination

The parties agree that Johnson's sex discrimination claims are governed by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and its burden-shifting analysis[5]. *See* docket nos. 43-1, 46-13. The Eighth Circuit Court

---

[5]Johnson brings sex discrimination claims under federal law, pursuant to Title VII, and state law, pursuant to the Iowa Code chapter 216—the ICRA. The Supreme Court of Iowa has explained:

> When interpreting discrimination claims under Iowa Code chapter 216, we turn to federal law, including Title VII of the United States Civil Rights Act. . . . *See Bd. of Supervisors v. Iowa Civil Rights Comm'n*, 584 N.W.2d 252, 256 (Iowa 1998) ("In deciding gender discrimination disputes, we adhere to the Title VII analytical framework....")

*Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 7 (Iowa 2009). While adhering to the Title VII analytical framework, the Supreme Court of Iowa has made clear that it will not "substitute 'the language of the federal statutes for the clear words of the Iowa Civil Rights Act.'" *Id.* (quoting *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989)). As a result, this court will analyze Johnson's state and federal sex discrimination claims together under the *McDonnell Douglas* burden-shifting framework, while separating its analysis when language of Title VII and the ICRA, and relevant precedent, requires.

of Appeals has recently repeated the three stages of this analysis:

> First, the plaintiff must establish a *prima facie* case for discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817. Second, the defendant may rebut the *prima facie* case by articulating a non-discriminatory rationale for its action. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Third, the plaintiff must prove that the defendant's proffered rationale was merely pretext for discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

*Dixon v. Pulaski County Special School Dist.*, 578 F.3d 862, 867 (8th Cir. 2009). The court will consider Johnson's sex discrimination claims in relation to each of these three stages.

### 1. *Johnson's prima facie case*

In order to establish a prima facie case of discrimination, Johnson must show: "'(1) that she is a member of a protected class; (2) that she was meeting her employer's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) that similarly situated employees outside the protected class were treated differently.'" *Humphries v. Pulaski County Special School Dist.*, 580 F.3d 688, 692 (8th Cir. 2009) (quoting *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008)). "Under the *McDonnell Douglas* framework, a presumption of discrimination is created when the plaintiff meets his burden of establishing a *prima facie* case of employment discrimination." *Pope v. ESA Services, Inc.*, 406 F.3d 1001, 1006 (8th Cir. 2005) (citing *Rothmeier v. Inv. Advisers, Inc.*, 85 F.3d 1328, 1332 (8th Cir.1996) in turn citing *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

FedEx does not dispute that Johnson can prove the first three elements of her *prima facie* case. In addition, FedEx assumes, for purposes of its summary judgment motion, that Johnson can generate a genuine issue of material fact concerning the fourth element—FedEx emphasizes that it only assumes Johnson can show a genuine issue of material fact regarding the "low threshold" standard for determining the issue of whether there is a similarly situated male employee at the *prima facie* stage. *See* docket no. 43 ("the 'low threshold' standard for determining the issue at the prima facie stage . . . only requires proof that a male employee was 'involved in or accused of the same or similar conduct' and was disciplined differently") (citing *Rodgers v. U.S. Bank*, 417 F.3d 845, 851-52 (8th Cir. 2005)). As the court will discuss in more detail below, the test for determining whether employees are similarly situated at the pretext stage, stage three of the *McDonald Douglas* burden-shifting analysis, is more rigorous. *See Wimbley v. Cashion*, 588 F.3d 959, 962 (8th Cir. 2009).

FedEx does not contest that Johnson can establish a *prima facie* case of sex discrimination, for purposes of its summary judgment motion. Therefore, the court finds that, for the purposes of this summary judgment motion, Johnson has established a presumption of discrimination, *see Pope*, 406 F.3d at 1006 (citations omitted), and the court will move to the second stage of the burden shifting analysis.

### 2. FedEx's legitimate, nondiscriminatory reason

Once a plaintiff establishes a *prima facie* case under the *McDonnell Douglas* burden-shifting analysis, the burden[6] shifts to the employer to "'articulate [a] legitimate, nondiscriminatory reason'" for the adverse employment action. *Montes v. Greater Twin*

---

[6] This burden is one of production. *See Pope*, 406 F.3d at 1007. "At all times, the burden of persuasion remains with the plaintiff." *Id.* (citing *Gagnon v. Sprint Corp.*, 284 F.3d 839, 847 (8th Cir.2002) in turn citing *St. Mary's*, 509 U.S. at 507, 113 S.Ct. 2742)).

*Cities Youth Symphonies*, 540 F.3d 852, 857 (8th Cir. 2008). "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Pope*, 406 F.3d at 1007 (citing *Floyd v. State of Missouri Dept. of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 936 (8th Cir.1999)). Once this burden has been met, the presumption of discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination. *Id.* (citations omitted).

FedEx alleges that Johnson was terminated for theft of company property. Johnson, although claiming this asserted reason is pretext for unlawful discrimination, does not contest—at least Johnson does not seriously contest in her brief—that FedEx has met its burden of production. Therefore, the court finds that FedEx has met its burden of production for purposes of this summary judgment motion, and that Johnson has the burden, of production and persuasion, to identify a genuine issue of material fact concerning whether FedEx's alleged reason for terminating her is pretext for unlawful discrimination. *See id.*

### 3. Pretext

#### a. Arguments of the parties

##### i. FedEx's initial arguments.

FedEx claims that Johnson cannot show pretext. Specifically, FedEx argues that Johnson cannot show that she and Charlton engaged in the same conduct without any mitigating or distinguishing circumstances. According to FedEx, Johnson—unlike Charlton—took company property that could have been purchased at the gas station a short distance from MCWA, never reported what she had done, and never offered to replace or replaced the property prior to her termination. FedEx emphasizes its accusation that Johnson told a co-worker that she was taking the washer

fluid as reimbursement for working through breaks and that she believed it was owed to her.

FedEx also claims that its interpretation of its policy prohibiting theft includes an exception for employees who report the use of company materials and offer to replace them. FedEx reasons that such actions do not suggest any intent to steal or cover up the individual's actions. FedEx insists that this court cannot question the wisdom of having such an exception to their policy on theft, because this court does not sit as a super-personnel department.

FedEx also alleges that Johnson cannot establish that FedEx did not honestly believe that she had engaged in theft and that Charlton had not done so. FedEx argues that Foell and Ziniel did not shoot from the hip but, instead, considered lesser discipline and ultimately concluded that termination was appropriate. FedEx additionally claims that Foell carried out the interpretation of the company policy as explained by Edwards, the Human Resources officer, whose duty it is to interpret company policies.

*ii.* ***Johnson's response***. Johnson claims that she can make a sufficient showing of pretext, because she can show Johnson was treated differently than a similarly-situated employee. According to Johnson, she and Charlton were similarly-situated employees, and she was treated differently when she was terminated and he was not even disciplined. Johnson specifically disagrees that Charlton's situation is distinguishable because he self-reported his behavior. Rather, Johnson alleges that Charlton only reported his behavior after Pritchard pressured him into doing so. Similarly, Johnson disagrees that Charlton's situation is distinguishable due to his decision to offer to reimburse FedEx for the used duct tape, as Johnson claims that she had already put personal washer fluid in her FedEx vehicle.

Johnson alleges that additional evidence of pretext is Foell's consistent pattern of giving preferential route assignments to men, refusing to accommodate women while accommodating men, not requiring men to work as late as women or perform unloading, scanning, and other menial tasks, and circumventing company policies to benefit men. Additionally, Johnson claims that Foell socialized with men differently than women and administered punishment to men more leniently. Lastly, Johnson claims that the company's decision to reverse her termination is an admission that Foell's discipline of Johnson was overly severe.

*iii.* **FedEx's reply**. In FedEx's reply brief, it first repeats the argument that Johnson and Charlton are not similarly situated because Charlton self-reported his conduct and offered to replace the company materials that were used. FedEx also claims that Johnson's allegation that she provided FedEx with washer fluid when she put personal washer fluid in her FedEx truck is irrelevant. According to FedEx, even if such an action had been taken, there is a procedure that Johnson could have followed to obtain reimbursement for the washer fluid used in her truck. FedEx claims that the differences between Johnson's and Charlton's actions show that Johnson had an intent to steal the washer fluid while Charlton did not have the intent to steal the duct tape.

FedEx also alleges that there are other differences between Johnson's and Charlton's conduct. First, FedEx claims that Charlton reported Johnson's conduct while no other employee reported Charlton's conduct. Second, FedEx argues that there is evidence that Johnson told another employee that the fluid was owed to her as reimbursement for working through her breaks. Third, FedEx alleges that Johnson's claim that she needed washer fluid to get home safely was not credible, based on the weather information that they obtained.

FedEx also claims that sex discrimination cases focus on the intent of the decision-maker. As a result, FedEx argues that, even if it was mistaken about whether Johnson violated the policy against theft while Charlton did not, it did not intend to discriminate and cannot be held liable.

Lastly, FedEx alleges that Johnson's claims of other behavior demonstrating bias against women are based on inadmissible evidence. FedEx claims that Johnson only makes conclusory allegations concerning this other behavior, and the court should not consider the evidence.

*iv.* ***Oral arguments***. While not conceding that Foell and Ziniel learned prior to the depositions in the case that Charlton had not been completely forthcoming about why he reported his use of duct tape to Foell, FedEx's counsel argued that the court should view Foell and Ziniel's decision to terminate Johnson, and not to discipline Charlton, at the time each decision was made. According to counsel, Foell and Ziniel had a good faith belief that Johnson had violated FedEx's theft policy, and that Charlton had not, at the time they determined the discipline for each employee. While conceding that Charlton may not have been as forthcoming as Foell believed, defendant's counsel insisted that this fact was irrelevant because the decision was already made.

FedEx's counsel also argued that Johnson has failed to show that its asserted exception to the theft policy was not consistently followed by FedEx. Counsel claimed that Johnson should have requested discovery concerning other individuals who have been terminated for theft, if she wanted to establish whether or not the policy, and the policy exception, were consistently followed. In addition, counsel claimed that the court should consider that Foell and Ziniel were simply following Edwards's interpretation of the policy when it decided not to discipline Charlton.

Johnson's counsel argued that the court should view Foell and Ziniel's decision to terminate Johnson based on the facts as they knew them in March of 2006. Counsel claimed that, in March, Ziniel understood the role that Pritchard played in Charlton's decision to report his use of duct tape to Foell. Counsel alleged that, once Pritchard informed Ziniel that Pritchard had caused Charlton to report the use of duct tape, there was no difference between Charlton's and Johnson's conduct and Ziniel could have modified the discipline, or lack of discipline, either of them received. Counsel stressed that, despite knowing their differential treatment of Johnson and Charlton was inappropriate, FedEx failed to even investigate the circumstances surrounding Charlton's use of duct tape—they allegedly did not ask for statements from anyone who may have observed Charlton's use of duct tape but instead tried to shove the incident under the rug.

Johnson's counsel also argued that Johnson's reinstatement was evidence of an implicit acknowledgment that the termination was improper. FedEx's counsel, however, claims that the company reinstated her because of a vice president's decision to exercise mercy based on Johnson's tenure, and the decision to reinstate Johnson was not the result of a finding that she did not violate FedEx's policy against theft.

### b.    Analysis

There are various ways in which an employee can make a sufficient showing of pretext. *See Arnold v. Nursing and Rehabilitation Center at Good Shepherd, L.L.C.*, 471 F.3d 843, 847 (8th Cir. 2006). The Eighth Circuit Court of Appeals has explained:

> A plaintiff may make a sufficient showing of pretext by different means, including showing that an employer: (1) failed to follow its own policies, *Ledbetter v. Alltel Corporate Servs.*, Inc. 437 F.3d 717 (8th Cir.2006); (2) treated similarly-situated employees in a disparate manner, *Putman v. Unity Health Sys.*, 348 F.3d 732 (8th Cir.2003); and (3) made substantial changes over time in its proffered reason for an employment

26

> decision, *Kobrin v. Univ. of Minn.*, 34 F.3d 698 (8th
> Cir.1994), cert. denied, 522 U.S. 1113, 118 S.Ct. 1046, 140
> L.Ed.2d 111 (1998).

*Id.* In this case, Johnson claims that she can show FedEx's asserted reason for terminating her was pretext for sex discrimination, based on the treatment she received as compared to a similarly situated employee—Charlton. *See* docket no. 46-13.

At the pretext stage, "the test for determining whether [Charlton] is similarly situated to [Johnson] is rigorous." *Wimbley*, 588 F.3d at 962 (citing *Rodgers*, 417 F.3d at 853). "To be probative evidence of pretext, the misconduct of the more leniently disciplined employees must be of comparable seriousness." *Id.* (quoting *Rogers*, 417 F.3d at 853). In fact, the employees must be similarly situated in "all relevant respects." *Id.* "To satisfy this standard, '[t]he individuals used as comparators "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."'" *Rodgers,* 417 F.3d at 851 (quoting *Gilmore v. AT&T*, 319 F.3d 1042 (8th Cir. 2003) in turn quoting *Clark*, 218 F.3d at 918)). Under federal law, "an unlawful employment practice is established when a complaining party demonstrates that sex . . . was 'a motivating factor' for a discharge, even though other factors also motivated the discharge." *Roberts v. Park Nicollet Health Services*, 528 F.3d 1123, 1127 (2008) (citing 42 U.S.C. § 2000e-2(m); *Deneen v. Northwest Airlines, Inc.*, 132 F.3d 431, 435-36 (8th Cir.1998)). Under Iowa law, the plaintiff must show that "a prohibited criterion was a 'motivating factor' in the defendant's employment decision to establish a violation of the ICRA." *Gross v. FBL Financial Services, Inc.*, 588 F.3d 614, 618 (8th Cir. 2009) (citing *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1 (Iowa 2009)). A factor is a motivating factor under Iowa law if it "'played a part' in the employer's action. . . ." *Id.* (citing *Deboom*, 772 N.W.2d at 13).

Johnson claims that Charlton is a similarly situated male employee who was punished more leniently for similar conduct. Johnson and Charlton dealt with the same supervisor—Foell. They were subject to the same standards, specifically the FedEx Employee Handbook. The handbook contains Policy 2-5, which prohibits "Theft, including unauthorized possession of Company or customer property or the property of other employees. . . ." Defendant's App., p. 37. They also engaged in their unauthorized use of company property for their personal vehicles. Johnson was terminated for her use of company property while Charlton was not disciplined. The parties dispute, however, whether there are "any mitigating or distinguishing circumstances" between Johnson's and Charlton's conduct. *See Rodgers*, 417 F.3d at 851 (citations omitted).

The parties disagree on whether Charlton's alleged "self-reporting" of his behavior is a mitigating or distinguishing circumstance. Johnson reported her use of the washer fluid to Foell approximately five days after she used it. Johnson explains, in her deposition, exactly how she disclosed to Foell that she had used the washer fluid:

> A.  Well, Bob [Foell] had called me on the weekend, said we were having an early meeting, so I came in at 7:15, and both him and Mike [Ziniel] were sitting there, and they asked me if I had done anything against the policy, conduct policy in the last two weeks.
>
> Q.  Okay. What was your response?
>
> A.  I said the only thing I could think of is that I put some washer fluid in my car.

Plaintiff's App. at 57, p. 218. This meeting took place on Monday, January 9, 2006, approximately five days after the use of the washer fluid—Johnson had used the fluid on January 4, 2006, and Charlton reported Johnson's behavior to Foell on January 6, 2006. Foell explains part of this delay in confronting Johnson: "By the time I had finished

interviewing . . . witnesses on January 6, Ms. Johnson had already gone home for the day. I called her on Sunday, January 8, 2006, and asked her to come in early on Monday, January 9 for a meeting." Defendant's App. at 13.

Charlton used FedEx duct tape on February 2, 2006, and reported his use of the duct tape to Foell approximately a day later. Charlton admitted that he may not have intended to report his behavior prior to Pritchard pressuring him to do so:

> Q. Did you have any intention of telling Mr. Foell that you had used some duct tape before Mr. Pritchard asked you that question?
>
> A. I had thought about it. Yes. To answer your question, yes.
>
> Q. You had thought about it, but had you actually done it?
>
> A. No, I had not.
>
> Q. Did you actually intend to do it?
>
> A. No, I don't believe, at the time, I had—originally when I had done it, no.

Plaintiff's App. at 5-6, pp. 20-21. In his deposition, Charlton also explains that he may have admitted to Foell that he was reporting his use of duct tape because of Pritchard's comments:

> Q. Did you tell [Foell] that the only reason you were reporting [the use of duct tape] was because [Pritchard] brought it to your attention?
>
> A. It's possible that I did tell him that, that is why I reported it to him. I'm not sure if I told that to [Foell] or not.
>
>   . . .
>
> A. No, I can't say for sure that I brought it up to him.

Plaintiff's App. at 6, pp. 27-28.

There is also evidence in the record that Ziniel was made aware of Pritchard's role in pressuring Charlton to report his use of the duct tape, sometime in March:

Q.     In fact, Sean Pritchard had a conversation with you about [the duct tape] incident, didn't he?

A.     With me about that?

Q.     Yes.

A.     Yes.

Q.     And what did he tell you?

A.     He asked me if I was aware of the duct tape situation between [Charlton] in Mason City.

Q.     What did you tell him?

A.     I said I was aware of that and that case had been investigated, and it was taken care of.

Defendant's App. at 152, p. 75.  Pritchard also claims that he provided Ziniel with a letter suggesting that Charlton only reported his use of duct tape because of the pressure Pritchard put on him, while Ziniel denies ever receiving the letter.  *See id.*

Because a reasonable jury could find that both Johnson and Charlton only reported their behavior after being pressured to do so—and that Foell and Ziniel knew that Charlton was pressured, possibly even more than Johnson, to report the behavior—the court finds that there is a genuine issue of material fact concerning whether Charlton's method of reporting is a "mitigating or distinguishing circumstance" that would defeat Johnson's claim that she and Charlton are similarly situated.  *See Rodgers*, 417 F.3d at 851 (citations omitted).

The parties also disagree concerning whether Charlton's offer to replace the duct tape is a mitigating or distinguishing circumstance.  Johnson admits that she did not offer to replace the washer fluid after using it, but she claims that she was owed washer fluid due to her use of personal washer fluid in her FedEx truck.  Similarly, Johnson claims that

she routinely purchased batteries for her tracker, *see* Defendant's App. at 94, p. 227, and received un-reimbursed calls on her personal cellular telephone. *See* Plaintiff's App. at 98. Johnson disputes whether she stated that the washer fluid was owed to her for working during breaks but claims that replacing the washer fluid was unnecessary because she had used personal washer fluid in her FedEx truck. Johnson claims that she had already used personal washer fluid in her FedEx vehicle—which could be reasonably considered indistinguishable from offering to replace the washer fluid she used—and the court will not decide whether Johnson's claim that she had, in essence, already provided FedEx with washer fluid is credible. *See Kammueller*, 383 F.3d at 784 ("because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of witnesses").

FedEx claims that the distinguishing characteristics it identifies have added significance because they are part of FedEx's exception to the theft policy. This exception allegedly excludes, from the theft policy, use of company property when, "soon after the event, the employee reports what he did and then offers to replace what he used, since such actions do not suggest any intent to steal or cover up the individual's actions." Docket no. 43-1 (citing Defendant's App., pp. 33-34, Edwards Decl., ¶¶ 20-21). Edwards also explained FedEx's analysis of whether to excuse Johnson from the theft policy: "The totality of the circumstances involving Ms. Johnson demonstrated to me that she knew what she was doing was wrong and intended to deprive the company of the washer fluid." *Id.* at p. 34, ¶ 21.

The court, first, notes that many of FedEx's claims concerning the totality of the circumstances surrounding Johnson's and Charlton's respective uses of company property differ because the company investigated Johnson's use of washer fluid but not Charlton's use of duct tape. For example, FedEx claims that Johnson could have purchased washer

fluid at a gas station a short distance from MCWA and argues that its research concerning the road conditions on the day Johnson used the washer fluid show that she did not actually need it. However, FedEx failed to investigate whether the same gas station carried duct tape or whether Charlton's car was unsafe to drive without the duct tape that was applied to his headlight. Although Foell is not required to investigate the use of FedEx duct tape by determining whether the local gas station carries the tape, his failure to investigate Charlton's use of duct tape is telling when contrasted with the research he did in response to Johnson's claim that she needed a small amount of windshield washer fluid in order to get home safely. In fact, Charlton explains that Foell told him, after he reported the use of duct tape, "don't worry about it, we'll talk about it tomorrow when I come in, or—I don't know if he said tomorrow, but it would have been the next time that he was in the station while I was there." Plaintiff's App. at 5, p. 21. Charlton explains the actions Foell took following his admission that he used company property:

Q. Did he do an investigation in regard to the duct tape, as far as you know?

A. Not that I know of.

Q. Did he ask you for a statement.

A. No.

Q. Did you hear anything about this incident, the one involving the duct tape, at any time before you left the company . . . in August 2006?

A. No, I had not.

Plaintiff's App. at 5, p. 23.

Insofar as the policy exception that Charlton allegedly met is not simply a totality of the circumstances evaluation, there is a genuine issue of material fact concerning whether FedEx properly applied it to Charlton but not Johnson—viewing the record in the light most favorably to Johnson. This criticism is not that it is unwise or bad business

decision to apply it to Charlton but not Johnson—it is well-established that "[c]ourts do not sit as super-personnel departments to second-guess the business decisions of employers." *Dorsey v. Pinnacle Automation Co.*, 278 F.3d 830, 837 (8th Cir. 2002) (citing *Wilking v. County of Ramsey*, 153 F.3d 869, 873 (8th Cir.1998)). Rather, its application to Charlton's, a male's, use of company property, but not Johnson's, a female's, similar use of company property, could reasonably be considered evidence of sex discrimination.

FedEx's arguments concerning its alleged policy exception are also less persuasive considering they failed to strictly comply with another policy when terminating Johnson. In Edwards's declaration, he states that "[u]nder both Policy 2-5 and Policy 2-50, the receipt of any combination of three written disciplinary notices in any 12-month period normally results in the employee's termination. Defendant's App. at 30. However, later in the declaration he explains that "termination was appropriate because Ms. Johnson had two prior disciplinary letters in 2004 and a third letter would have meant that she had 3 letters in a period of about 1 1/2 years, which we felt was excessive." Defendant's App. at 33. Neither Edwards, Foell, nor Ziniel explained how Johnson's three letters were so severe to warrant termination when the policy did not even require it.

Lastly, the court finds it unnecessary to determine whether Foell and Ziniel's decision to discipline Johnson but not Charlton was based on a "good faith belief" that she had violated the theft policy but that he had not. *See Richey v. City of Independence*, 540 F.3d 779 (8th Cir. 2008) ("If the employer takes an adverse action based on a good faith belief that an employee engaged in misconduct, then the employer has acted because of perceived misconduct, not because of protected status or activity."). Even if Ziniel and Foell had a "good faith belief" that Charlton had voluntarily self-reported his behavior in February, there is a genuine issue of material fact concerning whether Ziniel was informed of Pritchard's role in Charlton reporting his behavior in March. Since Johnson disputes

FedEx's decision not to award her full back pay in April, FedEx was aware of Pritchard's role when Johnson was reinstated without pay for thirty days of her suspension, which is what is at issue in this case. FedEx may dispute whether Charlton and Johnson are similarly situated considering Johnson's current claim for thirty days of back pay, but the court will leave that for the jury to decide. The court also notes that the "good faith belief" rule would apply if the court were only looking at FedEx's decision to discipline Johnson in January.

Viewing the record in the light most favorable to Johnson—and without even considering Johnson's arguments and evidence concerning the allegedly discriminatory work and route assignments—the court finds that Johnson has identified disputed facts that provide a genuine issue of material fact concerning whether she and Charlton are similarly situated employees who FedEx treated in a disparate manner. *See Arnold*, 471 F.3d at 847 ("A plaintiff may make a sufficient showing of pretext by . . . showing that an employer . . . treated similarly-situated employees in a disparate manner. . . .") (citations omitted). Therefore, the defendant's Motion for Summary Judgment will be denied as to Johnson's claims for sex discrimination under Title VII and the ICRA.

### C. Retaliation

FedEx has moved for summary judgment on Johnson's retaliation claims. *See* docket no. 43. In Plaintiff's Partial Resistance to Defendant's Motion for Summary Judgment (Oral Argument Requested), Johnson "does not resist Defendant's motion for summary judgment on her claim of retaliation." Docket no. 46. Therefore, the court will grant Defendant's Motion for Summary Judgment to the extent it seeks dismissal of Johnson's claims for retaliation.

### *III.   CONCLUSION*

THEREFORE, Defendant's Motion for Summary Judgment (docket no. 43) is granted in part and denied in part as follows:

1.      The motion is **denied** as to Johnson's claims for sex discrimination under Title VII and the ICRA;

2.      The motion is **granted** as to Johnson's claims for retaliation under Title VII and the ICRA.

**IT IS SO ORDERED.**

**DATED** this 26th day of January, 2010.

_Mark W. Bennett_
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA